1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

EAGLE SPE NV I, INC.,                )
                                     )
              Plaintiff,             )
                                     )                3:12-CV-00245-RCJ-WGC
       vs.                           )
                                     )
KILEY RANCH COMMUNITIES et al.,      )                **ORDER**
                                     )
              Defendants.            )
                                     )
_____)

This case arises out of the default of four commercial loans.  Pending before the Court is a Motion to Dismiss Counterclaim and Defense (ECF No. 52).  For the reasons given herein, the Court grants the motion.

**I.      FACTS AND PROCEDURAL HISTORY**

Between April 2007 and February 2008, non-party Colonial Bank gave Defendant Kiley Ranch Communities ("Kiley Ranch") four loans totaling $45 million (the "Loans") in order to build Kiley Ranch North (the "Development") in Sparks, Nevada. (*See* Am. Compl. ¶ 14, June 7, 2012, ECF No. 5).  Each of the Loans was made via its own promissory note and was secured by a Common Deed of Trust (the "CDOT") against the Development. (*Id.* ¶ 15).  The Loans were further secured by separate guaranties (the "Guaranties"), all of which were signed by Defendants Matthew N. Kiley, individually and as trustee of the Matthew N. Kiley Trust; Megan L. Kiley, individually and as trustee of the Megan L. Kiley Trust; L. David Kiley, as trustee of the

1   Matthew N. Kiley Trust and as trustee of the Megan L. Kiley Trust; and Michael and Kellee

2   Kiley, both individually and as trustees of the Michael P. Kiley and Kellee Kiley Living Trust

3   Instrument (collectively, "Guarantors"). (*See id.* ¶¶ 4–9, 16).[1]

4           Repayment on each of the Loans was originally due within one year, but Colonial Bank

5   granted Kiley Ranch three extensions on the $20 million, $2 million, and $13 million loans and

6   one extension on the $10 million loan via separate Loan Modifications. (*Id.* ¶ 17).[2]  When the last

7   of the Loans matured on July 20, 2009, Kiley Ranch owed Colonial Bank $41,023,667.99 under

8   the Loans. (*Id.* ¶ 18).

9           On August 14, 2009, the FDIC put Colonial Bank into receivership after the State

10  Banking Department of the State of Alabama closed it. (*Id.* ¶ 21).  The FDIC transferred the

11  rights to the Loans to non-party BB&T the same day, recording an "Assignment of Security

12  Instruments, Notes and Other Loan Documents" (the "FDIC Assignment") in Washoe County.

13  (*Id.* ¶ 22).[3]

14          On September 14, 2009, counsel for BB&T sent Kiley Ranch and Guarantors demand

15  letters as to each of the Loans. (*Id.* ¶ 19).[4]  On March 2, 2010, after Kiley Ranch and Guarantors

16  refused to honor the Notes and Guaranties, BB&T executed a Notice of Default and Election to

17  Sell (the "NOD"), which it recorded in Washoe County on March 4, 2010. (*Id.* ¶¶ 24–25).[5]  On

18  July 15, 2010, the trustee under the CDOT, non-party Western Title Co., noticed a trustee's sale

19

20  ───────────────────

21          [1]The Loan Agreements are adduced as Exhibits 1–4 to the Amended Complaint ("AC");
    the promissory notes (the "Notes") are adduced as Exhibits 5–8; the CDOT and modifications
22  thereto are adduced as Exhibits 9–11; and the Guaranties are adduced as Exhibits 12–15.

23          [2]The Loan Modifications are adduced as Exhibits 16–25 to the AC.

24          [3]The FDIC Assignment is adduced as Exhibit 30 to the AC.

            [4]The demand letters are adduced as Exhibits 26–29 of the AC.
25
            [5]The NOD is adduced as Exhibit 31 to the AC.

for August 12, 2010 via a Notice of Trustee's Sale (the "NOS"). (*Id.* ¶ 26).[6]  In August 2010,

however, before either the trustee's sale or the effective date of Nevada Revised Statutes

("NRS") section 40.459(1)(c), BB&T assigned its rights to the Notes, CDOT, Guaranties, and

other loan documents to Plaintiff Eagle SPE NV I, Inc. ("Eagle") via an Assignment of Deed of

Trust (the "BB&T Assignment"), which it recorded in Washoe County. (*See id.* ¶ 27).[7]  The

Development was eventually sold to non-party Rising Tides LLC via trustee's sale on November

8, 2011 for $9.8 million, after NRS section 40.459(1)(c) had taken effect. (*See id.* ¶ 28).[8]  The

fair market value of the Development on the date of the trustee's sale was approximately $10.5

million, (*id.* ¶ 30), leaving a  a deficiency of approximately $35,682,908.60, (*id.* ¶ 31).

Plaintiff sued Defendants in this Court on three causes of action: (1) Deficiency (against

Kiley Ranch); (2) Breach of Guaranty (against Guarantors); and (3) Breach of the Implied

Covenant of Good Faith and Fair Dealing (against Guarantors).  Defendants included with their

Answer a Counterclaim listing four causes of action: (1) Breach of Contract; (2) Breach of the

Implied Covenant of Good Faith and Fair Dealing; (3) Intentional Interference with Prospective

Economic Advantage; and (4) Declaratory Judgment.

Plaintiff moved to dismiss certain counterclaims and affirmative defenses as precluded by

a previous state court action.  Plaintiff also moved to dismiss Defendants' affirmative defense

and counterclaim under NRS section 40.459(1)(c), arguing that it did not apply retroactively to

the Loans.  Defendants asked the Court to certify the latter issue to the Nevada Supreme Court or

at least stay the case until the Nevada Supreme Court ruled in two pending consolidated appeals,

*Sandpointe Apartments, LLC v. Dist. Ct.*, No. 59507 and *Nielsen v. Dist. Ct.*, No. 59823, that

were expected to determine the issue or at least inform a resolution.  The Court denied the

---

[6]The NOS is adduced as Exhibit 32 to the AC.

[7]The BB&T Assignment is adduced as Exhibit 33 to the AC.

[8]The Trustee's Deed is adduced as Exhibit 34 to the AC.

1  motions to dismiss, without prejudice, and granted the motion to stay.  The Nevada Supreme

2  Court has now ruled on the merits in *Sandpointe* and denied the writ petition in *Nielsen*, and

3  Plaintiff has filed a new motion to dismiss the counterclaim and strike the related defense under

4  NRS section 40.459(1)(c).

5  **II.    LEGAL STANDARDS**

6      Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the

7  claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of

8  what the . . . claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47

9  (1957).  Federal Rule of Civil Procedure 12(b)(6) mandates that a court dismiss a cause of action

10 that fails to state a claim upon which relief can be granted.  A motion to dismiss under Rule

11 12(b)(6) tests the complaint's sufficiency. *See N. Star Int'l v. Ariz. Corp. Comm'n*, 720

12 F.2d 578, 581 (9th Cir. 1983).  When considering a motion to dismiss under Rule 12(b)(6) for

13 failure to state a claim, dismissal is appropriate only when the complaint does not give the

14 defendant fair notice of a legally cognizable claim and the grounds on which it rests. *See Bell*

15 *Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  In considering whether the complaint is

16 sufficient to state a claim, the court will take all material allegations as true and construe them in

17 the light most favorable to the plaintiff. *See NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898 (9th

18 Cir. 1986).  The court, however, is not required to accept as true allegations that are merely

19 conclusory, unwarranted deductions of fact, or unreasonable inferences. *See Sprewell v. Golden*

20 *State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).  A formulaic recitation of a cause of action

21 with conclusory allegations is not sufficient; a plaintiff must plead facts pertaining to his own

22 case making a violation plausible, not just possible. *Ashcroft v. Iqbal*, 556 U.S. 662, 677–79

23 (2009) (citing *Twombly*, 550 U.S. at 556) ("A claim has facial plausibility when the plaintiff

24 pleads factual content that allows the court to draw the reasonable inference that the defendant is

25 liable for the misconduct alleged.").  In other words, under the modern interpretation of Rule

8(a), a plaintiff must not only specify or imply a cognizable legal theory (*Conley* review), but also must plead the facts of his own case so that the court can determine whether the plaintiff has any plausible basis for relief under the legal theory he has specified or implied, assuming the facts are as he alleges them to be (*Twombly-Iqbal* review).

"Generally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion.  However, material which is properly submitted as part of the complaint may be considered on a motion to dismiss." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990) (citation omitted).  Similarly, "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss" without converting the motion to dismiss into a motion for summary judgment. *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994).  Moreover, under Federal Rule of Evidence 201, a court may take judicial notice of "matters of public record." *Mack v. S. Bay Beer Distribs., Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986).  Otherwise, if the district court considers materials outside of the pleadings, the motion to dismiss is converted into a motion for summary judgment. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 2001).

## III.    ANALYSIS

The Court will first address the applicability of NRS section 40.459(1)(c) to the present case.  That section was added to the NRS by § 5 of Assembly Bill 273 ("AB 273").  Prior to AB 273, the statute read:

> After the hearing, the court shall award a money judgment against the debtor, guarantor or surety who is personally liable for the debt.  The court shall not render judgment for more than:
>
> 1. The amount by which the amount of the indebtedness which was secured exceeds the fair market value of the property sold at the time of the sale, with interest from the date of the sale; or

2.  The amount which is the difference between the amount for which the property was actually sold and the amount of the indebtedness which was secured, with interest from the date of sale,

whichever is the lesser amount.

Nev. Rev. Stat. § 40.459(1)–(2) (1993).  AB 273 amended the statute, in relevant part, to read:

1.  After the hearing, the court shall award a money judgment against the debtor, guarantor or surety who is personally liable for the debt.  The court shall not render judgment for more than:

(a)  The amount by which the amount of the indebtedness which was secured exceeds the fair market value of the property sold at the time of the sale, with interest from the date of the sale;

(b)  The amount which is the difference between the amount for which the property was actually sold and the amount of the indebtedness which was secured, with interest from the date of sale; or

(c)  If the person seeking the judgment acquired the right to obtain the judgment from a person who previously held that right, the amount by which the amount of the consideration paid for that right exceeds the fair market value of the property sold at the time of sale or the amount for which the property was actually sold, whichever is greater, with interest from the date of sale and reasonable costs,

whichever is the lesser amount.

Nev. Rev. Stat. § 40.459(1)(a)–(c) (2011).  In other words, before the June 10, 2011 effective date of AB 273, a deficiency upon foreclosure was limited to the lesser of debt minus fair market value ("fair debt deficiency") and debt minus sale price ("actual debt deficiency"), but as of June 10, 2011, wherever a debt has been assigned, the deficiency is limited to the least of fair debt deficiency, actual debt deficiency, price of assignment minus fair market value ("fair assignee loss"), and price of assignment minus sale price ("actual assignee loss").

Defendants argue that subsection (1)(c) applies to limit the deficiency that can be obtained in the present case, because Plaintiff obtained the Loans from BB&T (who in turn had obtained them from Colonial Bank via the FDIC's receivership).  Defendants also seek a declaratory judgment to that effect.  The application of the amendment would appear to limit any deficiency judgment Plaintiff could receive in the present case to the lesser of: (1) the price

1  Plaintiff paid BB&T for the Loans minus the fair market value of the Development on the sale

2  date ($10.5 million); and (2) the price Plaintiff paid BB&T for the Loans minus the sale price

3  ($9.8 million).

4         The Court briefly analyzed subsection (1)(c) in a previous order, noting that it appeared

5  the Nevada Legislature had determined that an assignee of a loan secured by real property could

6  not fairly be said to have any "deficiency" beyond his own losses.  The lender may take a great

7  loss when it sells a defaulted or troubled loan, but the assignee itself suffers no loss so long as a

8  debtor (or guarantor) makes good the difference between the price obtained at the trustee's sale

9  and the amount the subsequent beneficiary actually paid for the loan.  The Court noted that the

10  potential retroactivity of the legislation was controversial because assignees rely upon the

11  historical right to obtain a deficiency based upon the amount of the original loan when deciding

12  whether to purchase a defaulted loan.  Most such assignees purchase many defaulted loans

13  knowing that collection of a deficiency against many of them will not ultimately be successful.

14  The practice is profitable only because in some cases the assignee will obtain a deficiency

15  judgment in excess of his own investment, i.e., based on the original loan amount as opposed to

16  the discounted price at which it purchased the loan.  The practice is similar to that of debt

17  collectors generally and is also analogous to plaintiffs' attorneys' use of contingency fees, which

18  often greatly exceed the actual value of the labor performed in a given case in order to offset the

19  losses incurred in unsuccessful cases that generate no fees at all.  The surplus obtained in such

20  cases will (hopefully) offset the losses incurred in unprofitable cases, making the practice

21  profitable in the aggregate.

22         The Court previously noted that although it is clear that retroactive application of the

23  statute's new limitation could prejudice purchasers of defaulted loans who relied on their

24  previous right to a "full" deficiency when calculating the value of their purchases, the question

25  was whether and how the Legislature intended to make AB 273 retroactive as to the deficiency

1  provision.  Because a ruling upon those issues in the Nevada Supreme Court could have been

2  dispositive to the pending claims and counterclaims, the Court denied the previous motions to

3  dismiss without prejudice and stayed the case pending the Nevada Supreme Court's opinion.

4  The Court noted that although the resolution of the retroactivity issue before the Nevada

5  Supreme Court would not necessarily be dispositive of all issues in the present case, the Court

6  preferred to have those rulings before proceeding.

7       The Nevada Supreme Court has now ruled that NRS section 40.459(1)(c) does not apply

8  to cases where the foreclosure sale occurred before June 10, 2011, and it implied in dicta that the

9  application of the amended statute in all other cases may not constitute retroactive application of

10 the law, because the right to a deficiency judgment vests only upon the determination of the

11 amount of deficiency. *See Sandpointe Apts. v. Eighth Judicial Dist. Court*, 313 P.3d 849, 853–59

12 (2013).  The Court reasoned that the amount of a deficiency is crystallized at the point of sale,

13 and the right to the deficiency in that amount therefore vests at that time. *See id.* at 856.

14 Applying NRS section 40.459(1)(c) to trustee's sales occurring before the effective date of the

15 statute would therefore constitute retroactive application, *id.*, and the Legislature did not intend

16 the statute to be retroactive, *id.* at 858–59.  In the present case, the trustee's sale occurred on

17 November 8, 2011, and NRS section 40.459(1)(c) could therefore apply without directly

18 contradicting *Sandpointe*.  But neither does *Sandpointe* mandate the statute's application here.

19 The *Sandpointe* Court did not need to determine, and therefore did not address, whether the

20 statute applies under the present circumstances, because it was not faced with a pre-enactment

21 assignment and a post-enactment sale.  Plaintiff has again asked the Court to dismiss Defendants'

22 declaratory judgment counterclaim that NRS section 40.459(1)(c) limits the available recovery in

23 this case and to strike Defendants' related affirmative defense.  Plaintiff makes four main

24 arguments.

25 ///

A.      The Statutory Text

First, Plaintiff argues that the statute does not on its own terms apply to assignees of debt who acquire the assignment before a foreclosure sale.  Plaintiff argues that it did not "acquire[] the right to obtain the judgment from a person who previously held that right" under the statute, because Plaintiff obtained the debt before the trustee's sale, at which point, and not before, according to the *Sandpointe* Court, the right to the deficiency vested.  The Court rejects this argument.  Although the present right to collect a deficiency of a particular amount does not vest until a foreclosure sale, the right to obtain a deficiency judgment in the future (based upon ownership of the debt) is a valuable contingent right held by the creditor before any foreclosure proceedings commence.  That right is in a sense already vested before foreclosure, because the ability to foreclose exists only if the debtor owes the creditor a certain amount of money.  The foreclosure is just an action upon the security, and a deficiency judgment is just a remedy whereby the action upon the security will not frustrate the creditor's ability to make himself whole on the debt itself.  The concept of a deficiency judgment cannot exist in the absence of a deficiency, i.e., the fact that more money is already owed than the security for the debt is worth.  Plaintiff appropriately recognizes this elsewhere in its brief, particularly in the context of its Contract Clause argument.

Moreover, the statute speaks to the time that an assignee acquires the *right* to obtain a deficiency judgment, not the time that an assignee actually obtains the deficiency judgment itself.  The "right" referred to in the statute, i.e., the right "acquired" by the assignee, is the contingent right to obtain a deficiency judgment upon foreclosure, because it is a right "*to obtain* the judgment" in the future.  This reading is further supported by the fact that the statute notes that the assignee obtains this right "from a person who previously held that right," i.e., the assignor.  And the statute clearly does not contemplate that the assignor already had a deficiency judgment, because the statute begins, "If the person *seeking* the judgment acquired the right to obtain the

1  judgment from a person who previously held that right."[9]  Plaintiff interprets the statute as if it

2  read, " If the person seeking *to enforce* the judgment acquired ~~the right to obtain~~ the judgment

3  from a person who previously held that ~~right~~ *judgment*, the amount by which the amount of the

4  consideration paid for that ~~right~~ *judgment* exceeds the fair market value of the property . . . ."

5  The statute does not so read.

6  ### B.    Parent–Subsidiary Assignments

7        Second, Plaintiff argues that the application of NRS section 40.459(1)(c) to the

8  "administrative transfer" between BB&T and Eagle represents an absurd result not contemplated

9  by the Legislature.  The Court rejects this argument.  The statute makes no such distinction.  It

10  does not matter whether the transfer is between a parent company and its wholly owned

11  subsidiary, as Plaintiff argues is the case here.  Parent companies and their subsidiaries are

12  separate legal entities with distinct rights and responsibilities—a fact that companies in such

13  relationships are not shy to point out when arguing against personal jurisdiction, for

14  example—and the Nevada Legislature chose not to include any exception to the statute for

15  parent–subsidiary assignments.

16  ### C.    The Contract Clause

17        The third argument presents a much weightier consideration.  Plaintiff argues that

18  application of the statute to mortgages that had been assigned before the effective date would

19  violate the Contract Clause of the U.S. Constitution, regardless of when the foreclosure sale

20  occurs.  If that is true, the Court must then closely examine the Nevada Supreme Court's ruling

21  in *Sandpointe* to see if it can still, in light of that opinion, save the statute from constitutional

22  infirmity by restrictive interpretation.

23  _____

24        [9]If anything, it appears that the statute might not apply where the assignor already has a
judgment.  But it probably does.  The entire point of the statute is to prevent one from profiting

25  by purchasing real estate debt at a discount and then recovering the full value of the debt
instrument.

"No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ." U.S. Const. art. I, § 10, cl. 1. "It long has been established that the Contract Clause limits the power of the States to modify their own contracts as well as to regulate those between private parties. Yet the Contract Clause does not prohibit the States from repealing or amending statutes generally, or from enacting legislation with retroactive effects." *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 17 (1977). The Contract Clause is no barrier to otherwise legitimate legislation concerning the public welfare that incidentally abrogates private contracts, so long as the "[l]egislation adjusting the rights and responsibilities of contracting parties [is] upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption." *Id.* at 21–23. The Court of Appeals has stated the test as follows:

> Whether a regulation violates the Contract Clause is governed by a three-step inquiry: The threshold inquiry is whether the state law has, in fact, operated as a substantial impairment of a contractual relationship. If this threshold inquiry is met, the court must inquire whether the State, in justification, [has] a significant and legitimate public purpose behind the regulation, such as the remedying of a broad and general social or economic problem, to guarantee that the State is exercising its police power, rather than providing a benefit to special interests. Finally, the court must inquire whether the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption. Unless the State itself is a contracting party, as is customary in reviewing economic and social regulation, . . . courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure.

*RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1147 (9th Cir. 2004) (citations and internal quotation marks omitted) (alterations in original). This Court has opined on the potential constitutional problem with the retroactive application of the present statute in another case that involved a sister statute:

> Another provision of Assembly Bill 273, section 40.459(1)(c), probably could not apply retroactively here without implicating the Contract Clause, because that section limits an assignee creditor's recovery to the lesser of the amount the assignee paid for the debt minus the fair market value or the amount the assignee paid for the debt minus the amount actually recovered at a foreclosure sale. The retroactive application of section 40.459(1)(c) would seriously interfere with the benefit of the assignee's bargain with his assignor, because the purchaser of debt typically purchases at a discount based upon his estimation of the chances that the debt will

1

be recoverable. An interceding statute limiting recovery based upon the amount
actually paid for the debt would wreak havoc upon such contracts, which are only
profitable in the aggregate because although many purchased debts will ultimately
be worthless, many others (that were purchased at a discount) will be paid in full or
in part, making the endeavor profitable in the aggregate.

2

3

4    *Wells Fargo Bank N.A. v. Elefante*, No. 2:12-cv-1521, 2013 WL 4506002, at *3 (D. Nev. Aug.

5    21, 2013) (Jones, C.J.).[10]

6          The Court finds that the present statute cannot constitutionally apply to assignments made

7    before the statute's effective date. First, it is clear that the statute substantially impairs any

8    existing assignment by reducing the amount an assignee can recover on debt he already

9    purchased under a legal regime where his potential recovery was not limited by the amount he

10   paid for the debt, and without any refund or other benefit offsetting the loss in value. The

11   threshold test having been satisfied, the Court must examine the second and third steps of the

12   test.

13         Second, the amendment had a legitimate public purpose behind it, i.e., the remedying of a

14   broad and general social and economic problem. For several years prior to the enactment of the

15   statute, widespread real estate foreclosures were one of the State of Nevada's most significant

16   economic problems. At the same time, the State via this law did provide a benefit to special

17   interests. The statute was explicitly designed to reduce foreclosures in favor of alternatives by

18   eliminating the ability of a third party to profit by purchasing real estate debt at a discount and

19   foreclosing at full price. Because a third party can no longer profit by purchasing a defaulted or

20   troubled mortgage, banks have no buyers for such mortgages and must either foreclose

21   themselves or offer the mortgagor alternatives. The amended statute, if retroactively applied to

22   assignments made before the effective date, provides a windfall to a particular class (mortgagors)

23

─────────────────

24         [10]Although the Court identified the assignor–assignee contract as the contract to be
     impaired, it is not only this contract, but also the contract between the mortgagor and the
25   mortgagee that ultimately stands to be impaired, as the assignee stands in the shoes of the
     mortgagee with respect to rights and obligations under the mortgage.

1   that could not have been reasonably expected under the mortgage and assignment when made, to

2   the detriment of another distinct class (mortgage assignees).  The Supreme Court has approved

3   the impairment of contracts where reasonably necessary to prevent unexpected windfalls "to

4   'restrict a party to those gains reasonably to be expected from the contract' when it was adopted."

5   *U.S. Trust Co. of N.Y.*, 431 U.S. at 31 (quoting *City of El Paso v. Simmons*, 379 U.S. 497, 515

6   (1965)).  Here, by contrast, the State's impairment of the contracts *creates* an unexpected

7   windfall as opposed to avoiding one.  That is, the impairment of the contract here thwarts the

8   reasonable expectations of mortgage assignees and provides a windfall to mortgagors that could

9   not have been reasonably expected from the contract under the law existing when the contract

10  was made.  The law is therefore more in the character of a special interests benefit than a neutral

11  exercise of the police power.

12      Third, even if the law could be characterized as an interest-neutral exercise of police

13  power, the adjustment of the rights and responsibilities of the contracting parties is not based

14  upon reasonable conditions.  This case is not like *Home Bldg. & Loan Ass'n v. Blaisdell*, 290

15  U.S. 398 (1934), where the U.S. Supreme Court upheld as reasonable a temporary Minnesota

16  statute postponing foreclosure sales and extending redemption periods for residential

17  homeowners, during which time the defaulted homeowner was required to pay rental value to the

18  mortgagee:

19          The conditions upon which the period of redemption is extended do not
        appear to be unreasonable.  The initial extension of the time of redemption for thirty
20      days from the approval of the act was obviously to give a reasonable opportunity for
        the authorized application to the court.  As already noted, *the integrity of the
21      mortgage indebtedness is not impaired*; interest continues to run; the validity of the
        sale *and the right of a mortgagee-purchaser to title or to obtain a deficiency
22      judgment*, if the mortgagor fails to redeem within the extended period, *are
        maintained*; and the conditions of redemption, if redemption there be, stand as they
23      were under the prior law.

24  *Id.* at 445 (emphases added).  The statute's adjustment of the rights and remedies of an assignee

25  in the present case is not nearly so reasonable.  In *Blaisdell*, the mortgage debt was not impaired

1    at all, whereas here, the mortgage debt is necessarily impaired.  In *Blaisdell*, the ability to recover

2    a deficiency judgment based upon the value of the mortgage debt was not impaired at all,

3    whereas here, that ability is totally impaired.  The above-quoted passage from *Blaisdell* reads as

4    if the *Blaisdell* Court were distinguishing the case before it from the present case.

5           The Supreme Court has since noted that the emergency situation in Minnesota at the time,

6    the temporary nature of the challenged statute, and the narrow tailoring and reasonable terms of

7    the statute were critical to its survival under the Contract Clause. *See Allied Structural Steel Co.*

8    *v. Spannaus*, 438 U.S. 234, 242–43 (1978) ("The *Blaisdell* opinion thus clearly implied that if the

9    Minnesota moratorium legislation had not possessed the characteristics attributed to it by the

10   Court, it would have been invalid under the Contract Clause of the Constitution.").  The

11   *Spannaus* Court then recounted three interceding cases in which it had struck down state laws

12   under the Contract Clause. *See id.* at 243.

13          The first case cited was *W.B. Worthen Co. v. Thomas*, 292 U.S. 426 (1934).  The Court in

14   that case had ruled that the retroactive application of an Arkansas law preventing execution by a

15   judgment creditor upon life insurance benefits violated the Contract Clause because future,

16   contingent obligations under contracts fall within the Clause just as obligations pre-existing

17   under a contract when a law is passed, and the law at issue was not limited to any particular

18   emergency. *See id.* at 432–33 (citing *Sturges v. Crowninshield*, 17 U.S. 122 (1819) (Marshall,

19   C.J.) ("In the instant case, the relief sought to be afforded is neither temporary nor conditional.

20   In placing insurance moneys beyond the reach of existing creditors, the Act contains no

21   limitations as to time, amount, circumstances, or need.  We find the legislation, as here applied,

22   to be a clear violation of the constitutional restriction.")); *Spannaus*, 438 U.S. at 250 (indicating

23   in 1978 that the temporary nature of a contractual impairment is important). *But see Veix v. Sixth*

24   *Ward Bldg. & Loan Ass'n of Newark*, 310 U.S. 32, 39–40 (1940) (noting that the requirement of

25   an emergency or temporary solution may not be totally inflexible).  Here, as in *Thomas*, the

1    future, contingent right to a deficiency judgment is cognizable under the Contract Clause and

2    subject to the same protection against unreasonable state impairment.

3            Second, the *Spannaus* Court cited to *W.B. Worthen Co. v. Kavanaugh*, 295 U.S. 56

4    (1935).  The *Kavanaugh* Court ruled that three Arkansas laws diluting the rights and remedies of

5    bondholder mortgagees by, *inter alia*, extending the time for payment upon demand, reducing a

6    lateness penalty, extending the time to answer, increasing the statutory redemption period, and

7    removing the ability of a purchaser to possess the property during the redemption period without

8    paying rents violated the Contract Clause. *See id.* at 59.  The Court held the laws unconstitutional

9    as applied retroactively to existing mortgages, because the limitation upon available remedies

10   effectively impaired the rights under the contract as they existed when the contract was entered

11   into. *See id.* at 60. ("Not even changes of the *remedy* may be pressed so far as to cut down the

12   security of a mortgage without moderation or reason or in a spirit of oppression.  Even when the

13   public welfare is invoked as an excuse, these bounds must be respected." (emphasis added)).

14   "[T]he laws which existed at the time the contract was entered into and which affect its validity,

15   construction, discharge and enforcement, in effect, are incorporated within the contract." *In re

16   LaFortune*, 652 F.2d 842, 846 (9th Cir. 1981) (citing *Blaisdell*, 290 U.S. at 429–30).  Although

17   the method of enforcing one's rights may be reasonably adjusted without impairing the value of

18   the contract under the meaning of the Contract Clause, a change in available remedies may not

19   "so affect the remedy of the creditor as to substantially impair and lessen the value of the

20   contract." *Id.* at 846–47 (contrasting *Honeyman v. Hanan*, 302 U.S. 375, 378 (1937) (holding

21   that a law requiring the amount of a deficiency to be determined in the foreclosure suit itself, and

22   not separately, did not impair the value of the mortgage contract itself), from *Edwards v.

23   Kearzey*, 96 U.S. 595, 599–01 (1877) (holding that an intervening law protecting a homestead

24   from attachment to satisfy a judgment debt could not withstand scrutiny under the Contract

25   Clause)).  *Edwards* and *In re LaFortune* make it clear that whether characterized as an

impairment of a right or a remedy, it is impairment of the *value* of a contract as it existed when

entered into that offends the Contract Clause. *See id.*; *In re LaFortune*, 652 F.2d at 848 (holding

that a homestead exemption could not constitutionally apply to debt incurred before the

enactment of the exemption). An extended passage from the *Edwards* decision is worth

reproducing here:

> The Constitution of the United States declares that "no State shall pass any . . . law impairing the obligation of contracts."
>
> A contract is the agreement of minds, upon a sufficient consideration, that something specified shall be done, or shall not be done.
>
> The lexical definition of "impair" is "to make worse; to diminish in quantity, value, excellence, or strength; to lessen in power; to weaken; to enfeeble; to deteriorate." Webster's Dict.
>
> "Obligation" is defined to be "the act of obliging or binding; that which obligates; the binding power of a vow, promise, oath, or contract," &c. *Id.*
>
> "The word is derived from the Latin word *obligatio*, tying up; and that from the verb *obligo*, to bind or tie up; to engage by the ties of a promise or oath, or form of law; and *obligo* is compounded of the verb *ligo*, to tie or bind fast and the preposition *ob*, which is prefixed to increase its meaning." *Blair v. Williams* and *Lapsley v. Brashears*, 4 Litt. (Ky.) 65.
>
> The obligation of a contract includes every thing within its obligatory scope. Among these elements nothing is more important than the means of enforcement. This is the breath of its vital existence. Without it, the contract, as such, in the view of the law, ceases to be, and falls into the class of those "imperfect obligations," as they are termed, which depend for their fulfilment upon the will and conscience of those upon whom they rest. The ideas of right and remedy are inseparable. "Want of right and want of remedy are the same thing." 1 Bac. Abr., tit. Actions in General, letter B.
>
> In *Von Hoffman v. City of Quincy* (4 Wall. 535), it was said: "A statute of frauds embracing pre-existing parol contracts not before required to be in writing would affect its validity. A statute declaring that the word 'ton' should, in prior as well as subsequent contracts, be held to mean half or double the weight before prescribed, would affect its construction. A statute providing that a previous contract of indebtment may be extinguished by a process of bankruptcy would involve its discharge; and a statute forbidding the sale of any of the debtor's property under a judgment upon such a contract would relate to the remedy."
>
> It cannot be doubted, either upon principle or authority, that each of such laws would violate the obligation of the contract, and the last not less than the first. These propositions seem to us too clear to require discussion. It is also the settled doctrine

1
2
3

of this court, that the laws which subsist at the time and place of making a contract enter into and form a part of it, as if they were expressly referred to or incorporated in its terms.  This rule embraces alike those which affect its validity, construction, discharge, and enforcement. *Von Hoffman v. City of Quincy*, *supra*; *McCracken v. Hayward*, 2 How. 508.

4
5
6

In *Green v. Biddle*  (8 Wheat. 1), this court said, touching the point here under consideration: "It is no answer, that the acts of Kentucky now in question are regulations of the remedy, and not of the right to the lands.  If these acts so change the nature and extent of existing remedies as materially to impair the rights and interests of the owner, they are just as much a violation of the compact as if they overturned his rights and interests."

7
8
9

"One of the tests that a contract has been impaired is, that its value has by legislation been diminished.  It is not by the Constitution to be impaired at all.  This is not a question of degree or manner or cause, but of encroaching in any respect on its obligation,—dispensing with any part of its force." *Planters' Bank v. Sharp et al.*, 6 How. 301.

10

*Edwards*, 96 U.S. at 599–01.  However characterized, it is the *value* of a contract that is

11

ultimately to be protected against retroactive legislation under the Contract Clause.  Therefore,

12

even if the present statute were viewed as constituting an impairment "only" of a remedy and not

13

of a right, the statute's ultimate impairment of the expected pre-enactment *value* of the contract

14

based upon the face value of the debt and not based upon the price of any subsequent assignment

15

simply cannot withstand scrutiny under the case law.

16

Third, the *Spannaus* Court cited to *United States Trust Co. of New York*, which case is

17

cited, *supra*, for general propositions of Contract Clause law.  In that case, the State of New

18

Jersey was a party to the contract at issue, so the Court applied a heightened scrutiny that is

19

inapplicable here.

20

The *Spannaus* Court then noted that the Minnesota statute at issue there, which required

21

certain companies who terminated pension plans (or who closed Minnesota offices with

22

employees covered by such plans) to pay a "pension funding charge" to the State for every ten-

23

year employee covered by the plan, regardless of whether the employee had vested pension rights

24

under the private plan, *see Spannaus*, 438 U.S. at 239, imposed "severe" obligations upon the

25

company in contradiction to its bargained-for pension agreements with its employees, *see id.* at

245–46.[11]   The Court noted that the Minnesota Legislature had "chang[ed] the company's obligations in an area where the element of reliance was vital."  *See id.* at 246.

Likewise, here, an assignee's reliance upon the ability to collect the full amount owed under the mortgage is vital.  An assignee who purchases a defaulted mortgage under the amended statute can only profit thereby if the value of the security is greater than the price of the assignment plus the costs of foreclosure.[12]  And this will almost never be the case in practice, because where the value of the security minus the costs of foreclosure is greater than the price of a prospective assignment, no rational lender will sell the mortgage at such a price in the first place.  The lender is better off foreclosing himself and realizing a smaller loss than he is selling the mortgage for less than he can get through foreclosure.  This, of course, was the entire purpose of the statute: to eliminate the economic incentive for banks to sell defaulted mortgages rather than negotiate directly with homeowners.  The expectation under longstanding pre-amendment law was that an assignee could recover the full amount owed despite having purchased the debt at a discount.  Many such debtors will be insolvent or otherwise judgment-proof, and the low

---

[11]In making this finding, the Court noted that "severe" impairment of rights or obligations "will push the inquiry to a careful examination of the nature and purpose of the state legislation." *Id.* at 245.  Certainly, the impairment of an assignee's rights under an assigned mortgage in the present case is "severe," being a *per se* obliteration of the right to recover any amount that would permit him to profit from the assignment.  Indeed, the value of the impairment will necessarily be many times greater than the value of what remains of the contract, even in the odd case where the collateral is worth slightly more than the price of the assignment.  In the present case, the value of Plaintiff's bargain has been reduced from about $35 million to $0.  It purchased the right to pursue a $45-million judgment for $10 million, and the state reduced the benefit of its bargain to the right to commence a foreclosure and pursue a deficiency, if necessary, just to recover its investment and break even—"even," that is, assuming the state court were to award it all of its costs and fees in the foreclosure action.  The value of his bargain has been reduced from about $35,000,000 to the right to experience the hassle of a foreclosure and deficiency action and end up where he started financially.  Of course, the assignee can never recover the man hours wasted during the ordeal, and what was the consideration received for that unrecoverable loss?  Fun?  That state of affairs cannot satisfy the reasonableness requirement in the case law.

[12]Where this is not the case, he will have to pursue a deficiency, and obtain full fees and costs, just to make himself whole.

1    potential for significant recovery is surely what drove down the market price of defaulted

2    mortgages to a point where the practice was profitable in the aggregate.  But in each individual

3    case, a pre-amendment assignee has had the value of his contract severely impaired by

4    application of the amendment to his assigned mortgage.

5         Finally, the law in *Spannaus* "did not effect simply a temporary alteration of the

6    contractual relationships of those within its coverage, but worked a severe, permanent, and

7    immediate change in those relationships—irrevocably and retroactively." *Id.* at 250.  The same is

8    true here.

9         There are less strict alternatives that serve the purposes of the law.  The Nevada

10   Legislature could simply have prohibited outright the assignment of defaulted mortgages on

11   Nevada real property, or permitted them only for a fixed percentage of the amount due on the

12   loan.  In either case, no assignee would face the unexpected, retroactive destruction of the value

13   of his contract that Plaintiff faces here, because the law affecting any assignment contract would

14   be known at the time of assignment, and not only afterwards.  That option would also have

15   prevented the sale of mortgages at discount rates.  Similarly, the Nevada Legislature could have

16   provided additional pre-foreclosure safeguards to encourage foreclosure alternatives.  The fact

17   that the Legislature did just that in 2009 before the enactment of NRS section 40.459(1)(c) (via

18   the Foreclosure Mediation Program and the abolition of deficiency judgments against most

19   residential homeowners as to mortgages entered into in 2009 or later), contemporaneously with

20   its enactment in 2011 (via the Affidavit of Authority requirement and statutory penalties), and

21   after its enactment in 2013 (via the Homeowners' Bill of Rights), proves that there were less

22   strict alternatives that serve the purpose of the law.[13]  The Nevada Legislature could also have

23

24   _____

25        [13]Incidentally, although the statute makes no distinction, the present dispute does not
     concern the foreclosure of a homeowner's principal residence, but the foreclosure of a
     commercial development.

provided for tax credits or direct reimbursements of assignee losses due to the retroactive

application of NRS section 40.459(1)(c) and avoided the Contract Clause problem.

Moreover, the application of the statute to pre-enactment assignments does *nothing* to

further the purposes of encouraging negotiation between mortgagees and mortgagors, because

pre-enactment assignees had no reason to think that the value of their contracts would be limited

when they purchased mortgages before the law took effect.  Striking down the statute as applied

to pre-enactment assignments would not in any way frustrate the legitimate statutory purpose of

encouraging foreclosure-alternative negotiation and discouraging the assignment of defaulted

mortgages, just as applying the statute to pre-enactment assignments would not in any way

further the statute's purpose.

In opposition, Defendants rely upon *Gelfert v. National City Park*, 313 U.S. 221 (1941).

But that case provides no support for Defendants' argument.  In *Gelfert*, the homeowner had

given the bank a mortgage in 1932 at a time when New York's laws provided for a full

deficiency judgment after a foreclosure sale. *See id.* at 227.  In 1938, the bank obtained a

judgment of foreclosure for $18,401.25, and the bank's own nominee purchased the property at

the foreclosure sale for a mere $4000. *See id.*  The referee calculated a deficiency of $16,162.12

after taxes, fees, and expenses. *See id.*  The bank moved for a deficiency judgment in that

amount, and the homeowner asked the court to redetermine the deficiency based upon the fair

market value of the property because the price obtained at the foreclosure sale was "wholly

inequitable and unconscionable," i.e., commercially unreasonable. *See id.* at 227–28.  An

amendment to the relevant New York statute, which had become effective after the mortgage was

given but before the judgment of foreclosure was obtained, provided that, upon motion, the

amount of the deficiency judgment should be determined based upon the "fair and reasonable

market value of the mortgaged premises," and that the deficiency should be based upon the

higher of the amount received at the foreclosure sale or the fair market value of the property at

the time of sale. *See id.* at 228.  The trial court gave the bank a full deficiency judgment, and the

appellate division reversed because the bank had not moved under the new statute. *See id.* at 229.

The New York Court of Appeals reversed, ruling that the retroactive application of the amended

statute would violate the Contract Clause. *See id.*  The Supreme Court reversed because a

mortgagee could not be heard to complain of an intervening law limiting his recovery to the true

value of his contract, i.e., with any deficiency calculated based upon a sale for the greater of the

actual price of sale or the fair market value of the property at the time of sale. *See id.* at 231–34

(citing *Honeyman v. Jacobs*, 306 U.S. 539 (1939) ("Mortgagees are constitutionally entitled to no

more than payment in full.").

      Other cases of that era are in accord and simply stand for the proposition that a state may

enact laws preventing one contracting party from obtaining *more* than he was reasonably entitled

to under the contract when it was made without violating the Contract Clause, but none of these

cases permitted substantial impairment of the reasonably expected value of the contract at the

time the contract was made. *See Richmond Mortgage & Loan Corp. v. Wachovia Bank & Trust

Co.*, 300 U.S. 124, 128 (1937) (upholding a North Carolina statute limiting deficiency judgments

in non-judicial foreclosure sales, where the lender itself purchased the property, to the amount

that would have resulted if the property were sold at the fair market value) ("The Legislature may

modify, limit, or alter the remedy for enforcement of a contract without impairing its obligation,

*but in so doing, it may not deny all remedy or so circumscribe the existing remedy with

conditions and restrictions as seriously to impair the value of the right.*" (emphasis added));

*Honeyman*, 306 U.S. at 542–43 (holding that the New York law at issue in *Gelfert* did not impair

the value of the mortgage and therefore did not violate the Contract Clause simply because it

resulted in no deficiency judgment where the property sold at foreclosure was worth more than

the secured debt) ("*The question is whether in the instant case the denial of a deficiency

judgment substantially impaired appellant's contract right.*  The bond provided for the payment

to him of $15,000 with the stipulated interest.  The mortgage was executed to secure payment of that indebtedness.  The contract contemplated that the mortgagee should make himself whole, if necessary, out of the security but not that he should be enriched at the expense of the debtor or realize more than what would repay the debt with the costs and expenses of the suit.  Having a total debt of $15,771.17, with expenses, etc., of $1,319.03, appellant has obtained through his foreclosure suit the property of the debtor found without question to be worth over $25,000.  He has that in hand.  We know of no principle which entitles him to receive anything more." (emphasis added)).

Here, unlike in *Gelfert*, Plaintiff does not challenge any putative retroactive application of a fair-market-value-based deficiency calculation.  Nor could it.  The Nevada statute providing for a deficiency to be so calculated had been in place for almost forty years before the Loans and CDOT were given in 2007 and 2008. *See* Nev. Rev. Stat. § 40.459 (1969) ("After the hearing . . . the court may award a money judgment against the defendant or defendants personally liable for the debt.  The court shall not render judgment for more than the amount by which the amount of indebtedness which was secured by the mortgage, deed of trust or other lien at the time of the foreclosure sale or trustee's sale, as the case may be, exceeded the fair market value of the property sold at the time of such sale, with interest from the date of such sale.  In no event shall the court award such judgment, exclusive of interest after the date of such sale, in an amount exceeding the difference between the amount for which the property was actually sold at the foreclosure sale or trustee's sale and the amount of indebtedness which was secured by the mortgage, deed of trust or other lien at the time of such sale.").  That is, the limitation on recovery under the mortgage approved by the *Gelfert* Court applies without controversy here, and the assignee is not attempting to "get more than the amount of [his] contract[]." *See* 313 U.S. at 234.  Defendants do not contend that Plaintiff stands to recover more than the value of the mortgages, as did the various parties in the Depression-era cases cited, *supra*.  The contracts

1  Plaintiff seeks to enforce through foreclosure and deficiency are the *mortgage contracts* between

2  the mortgagee and the mortgagor, not the *assignment contract* between it and the mortgagee.

3  The fact that an assignee may profit because he purchased the mortgage contract from the

4  original mortgagee at a "discount" is relevant neither to whether any party will be made "more

5  than whole" upon the mortgage contract itself nor to whether any party will be "oppressed."

6        Defendants read *Gelfert* so as to imply a broad rule under which any law should survive

7  Contract Clause scrutiny so long as the law is directed to preventing a party from realizing a

8  profit in some endeavor as a general matter.  There is no such rule.  The *Gelfert* Court held that it

9  did not frustrate the goal of protecting parties' reasonable contractual expectations underlying the

10 Contract Clause to limit a contracting party to his expected benefit under the contract.  The bank

11 in *Gelfert* was held to be entitled to the proper benefit of its bargain: the debt balance, plus

12 interest and fees, minus the fair value of the collateral sold at auction.  That is all an assignee-

13 mortgagee seeks to obtain: the benefit reasonably expected under the mortgage contract

14 purchased.  Of course, an assignee seeks to obtain more under the mortgage than he paid to

15 obtain the mortgage, but that is quite a different matter from seeking more under the mortgage

16 than he is entitled to thereunder.  The assignee seeks neither more than he was entitled to under

17 his assignment contract (the right to enforce the mortgage instruments) nor more than the

18 mortgagee was fairly entitled to under those documents, i.e., the fair value of the mortgage

19 contract.  If the assignor is willing to part with the mortgage for less than face value, that is a

20 matter between the assignor and the assignee that has nothing to do with the assignee's rights

21 under the assigned mortgage.  Assuming a proper assignment, an assignee of a note and deed of

22 trust has the same right to enforce those instruments as the original beneficiary had. *See, e.g.*,

23 *Einhorn v. BAC Home Loans Servicing, LP*, 290 P.3d 249, 252–53 (Nev. 2012) (citing Nev. Rev.

24 Stat. § 104.3301; *Edelstein v. Bank of N.Y. Mellon*, 286 P.3d 249, 260–62 (Nev. 2012)).

25

1    If an assignee could not expect to realize the fair value of an assigned mortgage, there

2    would be no benefit from purchasing a mortgage at a discount, just as there would be no benefit

3    to a lender in giving a loan in the first instance if he could not recover interest or fees upon

4    repayment.  A lender under such a regime could only hope to break even (minus his time and

5    labor), just as a mortgage assignee under NRS section 40.459(1)(c) can only hope to break even,

6    such that no rational actor would enter into those respective activities.  Could anyone honestly

7    maintain that the Contract Clause, and perhaps even the Due Process Clause, would not be

8    violated by an intervening statute limiting (not temporarily, but permanently) mortgage

9    repayment on existing mortgages to the principal loan amount, and with no refund or other

10   offsetting benefit from the state, because, after all, the mortgagee cannot be heard to complain

11   that he is getting his money back and no more?  The question is not whether a party to a contract

12   gets his money back but whether he gets the expected benefit of his bargain, i.e., whether the

13   value destroyed by the intervening statute is part of the value the party reasonably expected to

14   obtain under the contract according to the law as it existed when the contract was made.  That is

15   what it means to be "made whole."  Retroactively limiting an assignee–mortgagee's recovery to

16   the price of his assignment is no different under the Contract Clause from retroactively limiting a

17   lender–mortgagee's recovery to the amount of the loan principal.  Neither is equitable, and

18   neither is constitutionally permissible.

19   The potential for "oppression" perceived  by the *Gelfert* Court arose out of the fact that a

20   bank could obtain more than is equitable from a homeowner by way of a deficiency judgment

21   where such a judgment were calculated based upon a foreclosure sale at below fair market value.

22   *See id.* at 232.  The Supreme Court's Depression-era adoption of this "exception" to the Contract

23   Clause was not really an exception at all but a straightforward application of the "fair dealing"

24   principal—a *contract* principal—that one party to a contract must not only adhere to the letter of

25   the contract but also must not inequitably alter the conditions under which a contract is

performed such that the letter of the contract benefits him in a way not contemplated by the parties:

> [E]ven though there was no breach of contract, a plaintiff may still be able to recover damages for breach of the implied covenant of good faith and fair dealing. Whether a breach of the letter of the contract exists or not, the implied covenant of good faith is an obligation independent of the consensual contractual covenants. The covenant of good faith and fair dealing is implied into every commercial contract. Under the implied covenant, each party must act in a manner that is faithful to the purpose of the contract and the justified expectations of the other party.

*Morris v. Bank of Am. Nev.*, 886 P.2d 454, 457 n.2 (Nev. 1994) (citations and internal quotation marks omitted). That is to say, a bank's sale of a foreclosed property for less than the fair market value (especially if sold to the bank's own agent, as in *Gelfert*) is an act of bad faith that violates the spirit of the contract even if not the letter. Limiting a deficiency to the amount based on the fair market value does nothing but hold the bank to its reasonable expectations under the purpose and spirit of the contract. In any case, the potential that this kind of shenanigans in foreclosure sales might lead to an inequitably inflated deficiency judgment has not existed in Nevada since at least 1969. The fact that an assignee–mortgagee may profit from foreclosure after purchasing the debt and security at a discount is simply not relevant to whether a mortgagor has been oppressed. The mortgagor is no worse off than if the lender had proceeded against him. Both NRS section 40.459(1)(a)–(b) and the common law rule requiring commercial reasonableness in foreclosure sales, *see Levers v. Rio King Land & Inv. Co.*, 560 P.2d 917, 919–20 (Nev. 1977), protect a mortgagor from the kind of oppression at issue in *Gelfert*, whether the foreclosing party is the original mortgagee or an assignee. If anything, under a retroactive application of NRS section 40.459(1)(c), it is mortgagors who stand to obtain more than the fair value of their contracts. *See Gelfert*, 313 U.S. at 234. The mortgagor, after all, has received all consideration due under the mortgage by having received the loan proceeds, but would then seek via the retroactive application of the statute to avoid giving full consideration under the contract in return.

///

1

### D.      The Supremacy Clause

2       Fourth, Plaintiff argues that application of the statute in the present case would violate the

3   Supremacy Clause by interfering with the FDIC's ability to operate as the receiver of a failed

4   bank.  That is, the FDIC is obligated to make good 80% of the receiver's losses.  Here, the

5   receiver is BB&T, and Plaintiff is BB&T's subsidiary.  The Court finds that although the issue

6   might be interesting in another case, in the present case the non-party receiver to whom the FDIC

7   will allegedly be liable to make good 80% of losses (BB&T) has already sold its interest in the

8   Loans to Plaintiff "for value received," according to the assignment Plaintiff itself has adduced.

9   BB&T has already incurred its losses.  The application of the statute to Plaintiff's own recovery

10  on the assigned Loans would not affect BB&T's own losses or the FDIC's alleged obligation of

11  partial reimbursement.

12                      ### E.      The Doctrine of Constitutional Avoidance

13      In summary, the Court cannot reconcile the application of the statute to assignments made

14  before its effective date with the Contract Clause.  The application of the statute to pre-enactment

15  assignments would severely impair the value of such assignments and the rights and obligations

16  under the mortgages thereby assigned and would destroy the reasonable expectations of the

17  assignee.[14]  Because this is a substantial constitutional matter, and not merely an incidental one,

18  the Court must attempt to interpret the statute narrowly to save it from constitutional infirmity.

19  *See, e.g.*, *Kim Ho Ma v. Ashcroft*, 257 F.3d 1095, 1106 (9th Cir. 2001).

20      The *Sandpointe* Court ruled that "the statute may not apply retroactively." 313 P.3d at

21  859.  The Court noted that the Legislature's statement that the statute "'become[s] effective upon

22  passage and approval' . . .  does not even begin to approach the type of express legislative

23  command necessary to rebut the presumption against retroactivity." *Id.* at 858 (quoting 2011

24  _____

25          [14]The application of the statute to post-enactment assignments presumably does not suffer
    from the same infirmity, but that issue is not before the Court.

1   Nev. Stat., ch. 311, § 7, at 1748).  The *Sandpointe* Court ruled that the statute could not apply to

2   foreclosure sales occurring before the effective date of the statute, *see id.* at 856, but it did not

3   decide (because the question was not presented) whether the statute necessarily applied to all

4   foreclosure sales occurring after the effective date of the statute.  Defendants' conclusion that

5   "[c]onsequently, . . . [the statute] applies to all deficiency judgments where the sale . . . occurred

6   on or after the effective date . . . ." does not follow. (*See* Opp'n 4:27–5:1, Feb. 21, 2014, ECF

7   No. 59).

8          The *Sandpointe* Court did not have occasion to consider the facts in the present case,

9   where the assignment occurred prior to the statute's effective date, but where the sale occurred

10  afterwards, and any language that could be read to imply that the law applies in such

11  circumstances is therefore dicta.  The Nevada Supreme Court could therefore interpret the statute

12  to apply only to assignments occurring after the effective date without contradicting *Sandpointe*.

13  That is, this Court could find that *Sandpointe* simply means that because the statute is not

14  retroactive, it cannot apply to foreclosure sales occurring before the statute's effective date,

15  leaving open the question of whether the statute can apply to post-enactment foreclosure sales by

16  parties with pre-enactment assignments, which is an additional aspect of retroactive effect under

17  the statute that the Nevada Supreme Court would have to consider in an appropriate case.

18         The Court might therefore maintain the present stay, deny the present motion, without

19  prejudice, and certify to the Nevada Supreme Court the following question: "Does Nevada

20  Revised Statutes section 40.459(1)(c) (2011) apply to assignees who obtained the relevant

21  mortgage before the effective date of the statute but who did not complete foreclosure sales until

22  the effective date?"  But the Court will not do that, because the answer to the question will not be

23  "determinative of the cause." *See* Nev. R. App. Proc. 5(a); *Volvo Cars of N. Am., Inc. v. Ricci*,

24  137 P.3d 1161, 1164 (Nev. 2006) (adopting the Arkansas–California–New Mexico interpretation

25  of "determinative of the cause" as meaning that the answer will be determinative of at least part

of the federal case). Here, the Nevada Supreme Court's answer would affect only the reason

behind this court's inevitable dismissal of the counterclaim and affirmative defense under NRS

section 40.459(1)(c), not the outcome. If the Nevada Supreme Court were to answer "yes," this

Court would grant the motion to dismiss, striking the statute down under the Contract Clause as

sought to be applied here. If the Nevada Supreme Court were to answer "no," the Court would

grant the motion to dismiss because the statute would not apply in this case.

Because certification is not appropriate under the circumstances,[15] and because the statute

as applied here would violate the Contract Clause, the Court must interpret the statute, if

possible, not to apply to pre-enactment assignments. The Court finds that it can comfortably do

so. As the *Sandpointe* Court noted, there is a heavy presumption against interpreting statutes to

have any retroactive effect:

> The United States Supreme Court has explained that "the presumption against
> retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal
> doctrine centuries older than our Republic." And, from this court's inception, it has
> viewed retroactive statutes with disdain, noting that such laws are "odious and
> tyrannical" and "have been almost uniformly discountenanced by the courts of Great
> Britain and the United States." Not surprisingly, once it is triggered, the presumption
> against retroactivity is given considerable force. Thus, as we have observed, a statute
> will not be applied retroactively
>
> unless [(1)] the Legislature clearly manifests an intent to apply the statute
> retroactively, or [(2)] "it clearly, strongly, and imperatively appears from the
> act itself" that the Legislature's intent cannot be implemented in any other
> fashion.

313 P.3d at 858–59 (citations omitted). The *Sandpointe* Court noted that the statute did not

clearly manifest any legislative intent for retroactive application but only that it was to become

effective upon passage and approval. *See id.* at 858.

_____

[15]Nor will the Court certify other questions to the Nevada Supreme Court, as requested by
Defendants, i.e.: (1) whether NRS section 40.459(1)(c) applies only to post-judgment
assignments; and (2) whether NRS section 40.459(1)(c) applies to parent–subsidiary transfers.
The Court has resolved those questions in Defendants' favor with little difficulty.

1    The Court finds that just as the statute does not indicate a clear intent that it apply to cases

2    where the foreclosure sale occurs before the effective date, it likewise indicates no clear intent

3    that it apply to cases where the assignment occurs before the effective date.  As the Court has

4    noted, *supra*, the *Sandpointe* Court did not have occasion to address the latter issue.  Although a

5    plain reading of the statute does not indicate that application to pre-enactment assignments is

6    excepted, the date of assignment is clearly relevant to whether an application of the law would be

7    retroactive, because a pre-enactment assignee's rights and/or remedies under the law are severely

8    altered by the amendment regardless of whether the assignee had already completed a foreclosure

9    sale by the amendment's effective date, and the Court must therefore find a clear intent or

10   necessity for the law to be so applied. *See id.* at 858–59.

11          There is no clearly expressed intent for retroactive application to pre-enactment

12   assignments, and it is not "imperative[]" that the statute apply to pre-enactment assignments in

13   order to carry out the intent of the Nevada Legislature.  On the contrary, as noted, *supra*, one

14   intent of the statute—to discourage the assignment of defaulted mortgages at discount rates—is

15   *necessarily* not furthered by applying it to pre-enactment assignments, because it is impossible

16   for the law to have influenced a pre-enactment decision to sell or purchase a defaulted mortgage.

17   Nor does the application of the law to pre-enactment assignments further the law's other

18   purpose—to prevent assignees from aggressively pursuing foreclosure—because an assignee who

19   must foreclose and seek a deficiency judgment simply to break even under the statute as amended

20   has just as strong a motivation to foreclose as an assignee who stands to make a profit by seeking

21   a deficiency.  He will not profit as he initially expected, of course, but his motivation to foreclose

22   and thereby mitigate his losses presumably remains powerful.  Also, as the *Sandpointe* Court

23   noted, even when one analyzes the effect of the statute divorced form considerations of intent,

24   the prospective application of the statute will reach the vast majority of the loans the statute is

25   intended to affect, *see id.* at 859, such that it cannot be said that retroactive application is

1   necessary to vindicate the purposes of the statute.  Likewise here, excluding pre-enactment

2   assignments from the statute's scope would not destroy, or even meaningfully diminish, the

3   statute's overall effectiveness.

4        Finally, the *Sandpointe* Court noted that the subjective legislative history makes clear that

5   the statute was not meant to affect existing contracts. *See id.* ("Any lingering doubt regarding

6   whether the Legislature intended NRS 40.459(1)(c) to apply retroactively is quickly put to rest by

7   reference to its legislative history.  Although the language of the enactment provision is clear and

8   unambiguous, and reference to legislative history is therefore generally not needed . . . in this

9   case it simply clarifies that there was no intent that NRS 40.459(1)(c) was meant to apply

10  retroactively.  Throughout the various committee hearings, Assemblyman Conklin, the sponsor

11  of Assembly Bill 273, stated that the provisions could not be applied retroactively." (citation

12  omitted)).  As Plaintiff notes, Assemblyman Conklin specifically disavowed any intent for

13  retroactive application of the law when questioned about it in committee, citing precisely those

14  concerns that underlie the Contract Clause:

15        Assemblyman Segerblom:  Is this bill retroactive?

16        Assemblyman Conklin:  *No, it is not. You would be reaching back into
        contracts that were made under certain circumstances.*  If that were done, who would
17       ever want to sign a contract or do business in a state that would nullify contracts?
        Our laws should have been better, but we have also never been in the situation we are
18       in today.  We never envisioned a bubble so massive that literally 20 percent of the
        homes in the state would be delinquent at one time, that 5 out of every 100 people
19       would be foreclosed, and 80 percent of the homeowners in Las Vegas would owe
        more than their homes are worth.  We did not craft our laws in anticipation of this
20       scenario, and we should not.  *To retroactively pass laws would set a remarkably
        dangerous precedent for individuals and businesses that enter into contracts because*
21       *you will wonder how it can be enforced* or how it can change.

22  (Mins. of the Meeting of the Assembly Committee on Commerce and Labor, 2011 Leg., 76th

23  Sess. 7, Mar. 23, 2011, (Nev. 2011), ECF No. 31-1) (emphases added).  Specifically addressing

24  NRS section 40.459(1)(c), the following exchange occurred three days later in the same

25  committee:

1

Chair Atkinson:  So there is no retroactivity?

2

Assemblyman Conklin:  There is *no* retroactivity in this bill.  It is simply *all*
future action.  We could debate this, but *the retroactivity issue is a matter of*
*contract.  If Ms. Bustamante Adams and I enter into a contract, we do so under the*
*environment of laws that we have at that time.  Those laws are part of the contract*
*because they dictate how we draft the contract.*  Business does not want to operate
in an environment in which laws are changed to favor one or the other party after
they enter into a contract.  While on one hand it may be nice to retroactivate a law,
the precedent it sets is enormous and probably highly detrimental to the business
environment of Nevada.

3

4

5

6

7

Chair Atkinson:  *I agree with that assessment.  I wanted to ensure we had*
*that on the record* because I know it came up.  I think it would be a nightmare to go
backwards.  I appreciate that and your work.

8

9

(Mins. of the Meeting of the Assembly Committee on Commerce and Labor, 2011 Leg., 76th

10

Sess. 1–13, Mar. 28, 2011, (Nev. 2011), ECF No. 31-2) (emphases added).  It therefore appears

11

the Nevada Legislature intended that the law would have no retroactive effect that would

12

frustrate the expectations of contracting parties under the state of the law at the time their

13

contracts were made. *Cf. Edwards*, 96 U.S. at 601 ("It is also the settled doctrine of this court,

14

that the laws which subsist at the time and place of making a contract enter into and form a part

15

of it, as if they were expressly referred to or incorporated in its terms.").

16

The Court therefore rules that NRS section 40.459(1)(c) applies only where the

17

assignment at issue occurred on or after the effective date of that statute.  A contrary application

18

would violate the Contract Clause.  And the Court need not concoct any improbable

19

interpretation of the statute to save it from constitutional infirmity.  The Court's interpretation of

20

the statute follows easily from the lack of any objectively retroactive language, the lack of any

21

objective necessity for retroactive effect to carry out the statute's purposes, and the clearly

22

expressed subjective intent of the Nevada Legislature.

23

///

24

///

25

///

1

**CONCLUSION**

2          IT IS HEREBY ORDERED that the STAY is LIFTED.

3          IT IS FURTHER ORDERED that the Motion to Dismiss Counterclaim and Defense

4   (ECF No. 52) is GRANTED.

5          IT IS FURTHER ORDERED that the Motion to Certify (ECF No. 61) is DENIED.

6          IT IS SO ORDERED.

7   Dated this 24th day of March, 2014.

8

9                                    _____
                                     ROBERT C. JONES
10                                   United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25